IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Steven Douglas Altman, | ) | C/A No.: 1:16-2959-MGL-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Commissioner of Social Security Administration, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.      Relevant Background

    A.      Procedural History

On November 15, 2010, Plaintiff protectively filed an application for DIB in which he alleged his disability began on February 8, 2009. Tr. at 138 and 295–304. His application was denied initially and upon reconsideration. Tr. at 168–71 and 175–76. On

December 13, 2012, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Ronald Sweeda. Tr. at 79–111 (Hr'g Tr.). The ALJ issued an unfavorable decision on January 14, 2013. Tr. at 142–58. The Appeals Council subsequently remanded the claim to the ALJ in an order dated May 8, 2014. Tr. at 159–62. Plaintiff had a second hearing before the ALJ on December 19, 2014. Tr. at 42–78 (Hr'g Tr.). The ALJ issued another unfavorable decision on February 13, 2015, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 21–41. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–7. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on August 29, 2016. [ECF No. 1].

B.      Plaintiff's Background and Medical History

1.      Background

Plaintiff was 46 years old at the time of the most recent hearing. Tr. at 46. He completed high school. Tr. at 85. His past relevant work ("PRW") was as a maintenance mechanic. Tr. at 60. He alleges he has been unable to work since June 1, 2010.[1] Tr. at 420.

2.      Medical History

Plaintiff presented to Alex Duvall, M.D. ("Dr. Duvall"), on March 4, 2009. Tr. at 572. He indicated he had sustained an on-the-job injury three to four weeks earlier when

---

[1] Plaintiff's attorney indicated an amended alleged onset date of June 1, 2010, in correspondence dated December 15, 2014. Tr. at 420.

he fell approximately six feet from a platform. *Id.* He stated he landed on his feet, but fell backwards. *Id.* He reported he immediately noticed mild neck and lower back pain. *Id.* He described the pain in his lower back as radiating from his right buttock down his leg. *Id.* He stated his pain was worsened by prolonged sitting and driving. *Id.* Dr. Duvall observed Plaintiff to have no tenderness to palpation of his back or neck. *Id.* He indicated Plaintiff had full range of motion ("ROM") of his neck. *Id.* He assessed back and neck pain with some right sciatica. *Id.* He prescribed Elavil and referred Plaintiff to physical therapy for conservative management. *Id.* He authorized Plaintiff to return to work, but restricted him to no lifting over 10 pounds. Tr. at 574.

On March 19, 2009, Plaintiff complained of mild neck pain and persistent lower back pain that radiated down his right leg. Tr. at 570. He indicated his back and leg pain were exacerbated by prolonged sitting and some activities. *Id.* He denied weakness, but reported numbness. *Id.* Dr. Duvall observed Plaintiff to be nontender to palpation of his spine and to have +2 deep tendon reflexes ("DTRs") and a positive right straight-leg raising ("SLR") test. *Id.* He referred Plaintiff for magnetic resonance imaging ("MRI") and further evaluation from an orthopedist. *Id.*

On July 2, 2009, Plaintiff complained of pain in his neck and lower back that radiated down both legs. Tr. at 569. He stated his pain was worse with prolonged sitting. *Id.* He also endorsed some left knee pain. *Id.* He indicated he had neglected to follow up for an MRI because his parents had recently passed away. *Id.* Dr. Duvall again referred Plaintiff for an MRI. *Id.*

On July 15, 2009, Plaintiff reported feeling depressed following the deaths of his parents. Tr. at 568. He endorsed symptoms that included decreased sleep and appetite, but denied suicidal and homicidal ideations. *Id.* J. Vance Vandergriff, M.D. ("Dr. Vandergriff"), prescribed Trazodone. *Id.*

On August 10, 2009, an MRI of Plaintiff's lumbar spine showed mild, underlying congenital spinal stenosis with superimposed spondylosis. Tr. at 539–40. David D. Goltra, Jr., M.D., indicated the most significant abnormalities were at the L4-5 level, where there was evidence of mild signal loss within the intervertebral disc and a broad-based central disc protrusion that contacted both transiting L5 nerve roots. Tr. at 539 and 540. He stated the annulus projected "somewhat focally into the left neural foramen, closely approximating the exiting left L4 nerve root" and that there were "some type I endplate changes" and "a tiny endplate herniation" that extended into the superior endplate of L5. Tr. at 539.

On August 28, 2009, Plaintiff complained of pain that radiated down both legs, but was slightly worse on the right. Tr. at 564. He indicated he experienced some numbness and tingling. *Id.* Dr. Duvall reviewed the MRI results and informed Plaintiff that he had "multiple protruding discs some of which are impinging on the foramina and nerve roots." *Id.* He noted Plaintiff's back was nontender to palpation; that he had negative SLR tests; and that he had +2 DTRs. *Id.* He assessed lumbar radiculopathy. *Id.* He indicated Plaintiff had "failed conservative therapy" and referred him to an orthopedist for "injections and/or surgery." *Id.*

Plaintiff reported pain that radiated from his back to his groin on September 24, 2009. Tr. at 562. He indicated he had difficulty with prolonged standing and walking. *Id.* Luis T. Chastain ("Dr. Chastain") instructed Plaintiff to keep his scheduled appointment with the orthopedist. *Id.*

On October 8, 2009, Plaintiff and Dr. Chastain discussed his return to work. Tr. at 561. Plaintiff indicated he was "a little upset" about having to return to work before being examined by the orthopedist. *Id.* Dr. Chastain stated "I do feel pt can work w/ restrictions & filled out paperwork to that effect." *Id.*

Plaintiff presented to Mark E. Triana, D.O. ("Dr. Triana"), on October 15, 2009, for evaluation of lower back pain. Tr. at 531. He complained that his back pain radiated down his right leg and into his lateral right calf. *Id.* He stated he had attended one physical therapy session, but was unable to continue because the workers' compensation insurer had not approved the treatment. *Id.* He stated he was taking Motrin and was continuing to work, but was avoiding heavy lifting, pushing, pulling, and bending. *Id.* Dr. Triana observed Plaintiff to have intact muscle groups and DTRs and to have negative SLR tests. *Id.* He noted Plaintiff's MRI showed multi-level disc desiccation from L2 to L5-S1 with annular bulging. *Id.* He stated the most significant narrowing occurred at L4-5, where there appeared to be right and left neuroforaminal narrowing. *Id.* He indicated there was "a little protrusion of the disc at the far right neuroforamen at L3-4." *Id.* Dr. Triana felt that a lumbar epidural steroid injection ("ESI") might be beneficial. *Id.* He prescribed Ultram and limited Plaintiff to work activity that did not require lifting over 20

pounds, climbing ladders, crawling, or bending from the waist to the floor. Tr. at 532 and 533.

Plaintiff presented to Patricia R. Grant, M.D. ("Dr. Grant"), for pain in his bilateral legs and knees and mid-thoracic and lower back on October 27, 2009. Tr. at 437. He described his pain as ranging from zero to eight on a 10-point scale. *Id.* He reported intermittent numbness in his bilateral feet and legs and weakness in his knees, but denied having sustained falls. *Id.* Dr. Grant observed Plaintiff to have questionable SLR tests bilaterally, but stated distracted seated SLR tests appeared to be positive. Tr. at 438. She indicated Plaintiff had downgoing plantar reflexes and symmetrical patellar reflexes. *Id.* She noted Plaintiff had no pitting edema and palpable peripheral pulses. *Id.* She indicated he was tender over the bilateral lumbosacral junction and mildly tender over the sacroiliac ("SI") joints. *Id.* She stated Plaintiff was able to rise on his heels and toes and squat and rise without difficulty. *Id.* She assessed lumbar radiculitis, herniated nucleus pulposus, and regional myofascial pain. *Id.* She instructed Plaintiff to follow up with an L4-5 epidural steroid injection ("ESI") and to return to Dr. Triana for surgical consideration if he did not obtain sustained relief from ESIs. *Id.* Plaintiff followed up with Dr. Grant for an L4-5 interlaminar ESI on November 2, 2009. Tr. at 435.

On November 16, 2009, Plaintiff reported that he was "near pain free" and was "quite happy with his current level of pain control." Tr. at 433. However, he complained of a pulling ache in his right axial back that he rated as a two on a 10-point scale. *Id.* Dr. Grant observed some tenderness over direct compression of Plaintiff's facet joints—

particularly on the right side in the lumbosacral junction. *Id.* She directed Plaintiff to follow up with her as needed. *Id.*

On December 3, 2009, Plaintiff indicated the ESI provided great relief from his right leg pain. Tr. at 530. He reported pain in his left leg, weakness in his quadriceps, and a frequent feeling that his legs would give out. *Id.* Dr. Triana prescribed Lyrica and referred Plaintiff for another ESI. *Id.* He indicated Plaintiff should continue to work on light duty. *Id.*

On December 8, 2009, Plaintiff reported that his pain had returned and was worse on his left side. Tr. at 431. Dr. Grant administered another L4-5 interlaminar ESI. *Id.*

Plaintiff complained of left-sided pain and right knee pain on January 5, 2010. Tr. at 428. Dr. Grant administered left L4-5 and L5-S1 transforaminal ESIs. *Id.*

Plaintiff reported pain in his left leg that radiated to his calf and occasional numbness in his foot on January 27, 2010. Tr. at 528. Dr. Triana explained to Plaintiff that he may require back surgery in the future. *Id.* He recommended an x-stop procedure at the L4-5 level and indicated Plaintiff should remain on light duty until his follow up visit. *Id.*

On March 3, 2010, Plaintiff reported pain in his back that radiated through his left buttock and calf and caused numbness in his left foot. Tr. at 526. He complained of right-sided pain that radiated into his buttock. *Id.* He indicated he was continuing to work on light duty, but was having difficulty. Tr. at 526. He reported a swelling sensation in his left knee, but Dr. Triana observed no effusion, catching, or locking. *Id.* Dr. Triana noted Plaintiff had full ROM and good stability. *Id.* Despite finding no abnormality, he injected

Plaintiff's left knee with Marcaine, Lidocaine, and Kenalog. *Id.* He instructed Plaintiff to remain on light duty and to follow up in three months. *Id.*

Plaintiff complained of lower back pain that was radiating to his right leg on May 20, 2010. Tr. at 524. He stated his pain had been exacerbated because his job required a lot of twisting and climbing up and down stairs. Tr. at 524. Dr. Triana observed Plaintiff to have normal muscle groups, ROM, and DTRs. *Id.* He referred Plaintiff for MRIs of his cervical and lumbar spine and prescribed Vicodin. *Id.* He stated Plaintiff needed to stay out of work until after he reviewed the new MRI results. *Id.*

Plaintiff presented to J. Robert Alexander, M.D. ("Dr. Alexander"), for an independent medical evaluation on June 7, 2010. Tr. at 482–85. He reported lumbar and left lower extremity pain, intermittent bilateral foot paresthesias, and rare weakness. Tr. at 482. He rated his pain as a five on a 10-point scale. *Id.* He stated his pain was exacerbated by prolonged sitting and standing and was reduced by positional changes. *Id.* Dr. Alexander described Plaintiff as showing mild subjective discomfort and having increased pain with lumbar flexion greater than extension. Tr. at 483. He noted Plaintiff demonstrated no lumbosacral tenderness to palpation; no discomfort over the SI joints or sciatic notches; no spasms; intact heel and toes raises, motor and sensory examinations, and DTRs; and mildly positive SLR tests. *Id.* He recommended an updated MRI, electrodiagnostic testing, physical therapy, and either an intradiscal procedure or repeat transforaminal ESIs. Tr. at 484. He stated Plaintiff was not at maximum medical improvement and recommended he be limited to sedentary work not to exceed 10 pounds with positional changes as needed. Tr. at 485.

On June 16, 2010, an MRI of Plaintiff's cervical spine showed mild degenerative uncovertebral joint changes on the left at C3-4 and bilaterally at C5-6 and C6-7, as well as mild anterior osteophyte formation at C5 and C6. Tr. at 536. An MRI of his lumbar spine indicated multilevel degenerative disc disease and broad-based disc bulges that were most advanced from L3-4 through L5-S1. Tr. at 537–38.

On July 29, 2010, Plaintiff reported that his employer had terminated him after "[h]e was videotaped at a ballgame doing some activities with a camera." Tr. at 522. Dr. Triana indicated Plaintiff's MRI showed degenerative disc disease with disc changes at L2-3, L3-4, L4-5, and L5-S1 and neuroforaminal stenosis and central disc protrusions at L3-4 and L4-5. *Id.* He stated the MRI of Plaintiff's cervical spine showed a little anterior degeneration at multiple discs, but no posterior protrusion of the discs or neuroforaminal narrowing that would account for any significant radicular symptoms. *Id.* He explained to Plaintiff that he was reluctant to recommend a lumbar discectomy, fusion, and stabilization procedure because of his age. *Id.* Instead, he recommended a two-level x-stop procedure at L3-4 and L4-5. *Id.* Dr. Triana instructed Plaintiff to consider the x-stop procedure or employment that did not involve heavy lifting, pushing, pulling, twisting, bending, crawling, and reaching. *Id.* He refilled Plaintiff's prescription for Motrin and prescribed Xanax for anxiety and back spasms. *Id.* He stated Plaintiff was limited to "Deskwork" with no lifting, pushing, or pulling greater than 10 pounds and no climbing, twisting, or crawling. Tr. at 521.

Plaintiff complained of lumbar and left lower extremity symptoms and intermittent right lower extremity pain on August 20, 2010. Tr. at 477. Dr. Alexander observed

Plaintiff to have mild lumbosacral tenderness to palpation, but intact DTRs and motor and sensory examinations. *Id.* He reviewed Plaintiff's MRI results and indicated he had significant multilevel desiccation from L1-2 through L5-S1 and moderate-to-severe degenerative changes at L4-5 with significant recess and foraminal stenosis. *Id.* Electromyography ("EMG") and nerve conduction studies ("NCS") were unremarkable and showed no evidence of lumbar nerve root compression, peripheral nerve entrapment neuropathy, or peripheral sensory motor polyneuropathy. Tr. at 480. Dr. Alexander scheduled Plaintiff for a left lumbar ESI and prescribed Darvocet, Diclofenac, and Neurontin. Tr. at 478. He indicated on work status forms that Plaintiff could return to work on sedentary duty with positional changes as needed and lifting not to exceed 10 pounds. Tr. at 468, 472, 475, and 481.

Dr. Alexander administered a lumbar ESI at Plaintiff's left L4-5 level on September 2, 2010. Tr. at 476. On September 10, 2010, Plaintiff reported slight improvement overall, but no significant change following the ESI. Tr. at 474. Dr. Alexander observed Plaintiff to have mild lumbosacral tenderness, but an intact motor and sensory examination of his lower extremities. *Id.* He indicated he would schedule Plaintiff for transforaminal ESIs. *Id.* Plaintiff indicated he would prefer to avoid surgery and would proceed with nerve blocks as a last resort. *Id.*

Dr. Alexander administered left transforaminal ESIs at L4-5 and L5-S1 on September 16, 2010. Tr. at 473. Plaintiff reported his left lower extremities had markedly improved on September 27, 2010. Tr. at 471. He indicated he continued to experience lumbar axial discomfort with radiation to the gluteal region, but indicated it had

decreased. *Id.* He reported right lower extremity pain and paresthesias. *Id.* Dr. Alexander observed Plaintiff to have decreased lumbosacral and gluteal tenderness. *Id.* He indicated he would schedule Plaintiff for right transforaminal ESIs. *Id.*

On September 29, 2010, Dr. Triana indicated Plaintiff would be unable to perform his prior level of work, even if he underwent surgery. Tr. at 520. He stated an x-stop procedure may be productive in the short term. *Id.* He indicated he would be "very reluctant" to proceed with a three-level lumbar fusion, "which is what it would take to correct [Plaintiff's] disc pathology long term." *Id.* He instructed Plaintiff to continue taking his pain medication and to follow up in a few months. *Id.*

Dr. Alexander administered right transforaminal ESIs at Plaintiff's right L4-5 and L5-S1 levels on October 14, 2010. Tr. at 470. On October 22, 2010, Plaintiff reported his lower extremity symptoms were markedly improved following the right transforaminal ESI. Tr. at 468. He complained of intermittent lower extremity paresthesias and lumbar axial discomfort that presented with prolonged sitting and other activities. *Id.* Dr. Alexander observed Plaintiff to have mild lumbosacral and gluteal tenderness. *Id.* He indicated Plaintiff should continue his sedentary work status and use of Darvocet, Diclofenac, and Neurontin. *Id.* He stated he would consider an intradiscal procedure as an alternative to surgical intervention if Plaintiff's symptoms persisted. *Id.*

On January 14, 2011, state agency consultant Michael Neboschick, Ph. D. ("Dr. Neboschick"), considered Listing 12.04 for affective disorders and found that Plaintiff's impairment was not severe. Tr. at 492–505.

Plaintiff presented to Harriet Steinert, M.D. ("Dr. Steinert"), for a consultative orthopedic examination on January 31, 2011. Tr. at 506–07. He reported pain in his cervical and lumbar spine and described the pain in his lumbar spine as radiating down both legs into his feet and sometimes causing numbness and tingling. Tr. at 506. Dr. Steinert observed Plaintiff to have decreased ROM of his cervical spine,[2] but no tenderness to palpation of his neck. Tr. at 507. She indicated Plaintiff had full ROM in all four extremities and no tenderness to palpation, inflammation, swelling, or deformity in his joints. *Id.* Plaintiff demonstrated no sensory or motor deficits or muscle atrophy. *Id.* He had normal and equal grip strength and normal fine and gross motor skills bilaterally. *Id.* His DTRs and peripheral pulses were normal and equal in all extremities. *Id.* He was able to flex at the waist to 20 degrees[3] and demonstrated normal extension. *Id.* Dr. Steinert observed Plaintiff to have moderate tenderness to palpation and negative SLR tests. *Id.* She noted he was able to walk across the room with a limping gait, but no assistive device. *Id.* She indicated Plaintiff could perform heel and toe walking and tandem walking, but was unable to squat down. *Id.*

State agency medical consultant Cleve Hutson, M.D. ("Dr. Hutson"), completed a physical residual functional capacity ("RFC") evaluation on February 2, 2011. Tr. at 509–18. He indicated Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; occasionally climb ramps and

---

[2] Plaintiff demonstrated normal cervical flexion, lateral flexion, and rotation, but his extension was limited to 20 degrees with 60 degrees being normal. Tr. at 508.
[3] Normal lumbar flexion is to 90 degrees. Tr. at 508.

stairs, balance, stoop, kneel, crouch, and crawl; never climb ladders, ropes, and scaffolds; and occasionally reach overhead with the bilateral upper extremities. *Id.*

On April 7, 2011, Plaintiff complained of numbness and tingling in his hands. Tr. at 519. Dr. Triana observed the DTRs, muscle groups, and ROM in Plaintiff's upper extremities to be without gross focal deficit. *Id.* He stated Plaintiff's hand symptoms could not be explained and indicated he would refer him for EMG and NCS. *Id.* He stated he thought Plaintiff could "work at a maintenance job as along as he restricts his lifting, bending, pushing, pulling, climbing and crawling." *Id.*

Plaintiff underwent EMG and NCS of his upper extremities on May 12, 2011. Tr. at 544–46. The results were consistent with moderately-severe bilateral carpal tunnel syndrome that was worse on the left than the right. Tr. at 546.

On June 2, 2011, Dr. Triana indicated Plaintiff had early degenerative changes, but no neuroforaminal narrowing in his cervical spine. Tr. at 697. He indicated the findings in Plaintiff's neck could reasonably cause neck pain, but were not consistent with radicular symptoms. *Id.*

On June 7, 2011, Plaintiff complained to Dr. Chastain of right neck pain, erectile dysfunction, and fatigue. Tr. at 559. Dr. Chastain referred him for lab work. *Id.*

On June 15, 2011, Plaintiff and Dr. Triana discussed the EMG findings. Tr. at 696. Dr. Triana recommended surgical intervention and informed Plaintiff that he did not think conservative treatment would be effective in the long term. *Id.* He gave Plaintiff cock-up splints to wear at night and when using his hands for repetitive activities. *Id.* He indicated Plaintiff desired to plan carpal tunnel release surgery around family events that

were scheduled for the summer and should contact him when he was ready to schedule it. *Id.* Dr. Triana informed Plaintiff that he was not willing to consider lumbar surgery "at his age and at this time." *Id.* He indicated Plaintiff would have to be "much more symptomatic" for him to consider lumbar surgery. *Id.* He recommend Plaintiff manage his back pain with medication and restriction of activities. *Id.*

State agency medical consultant William Cain, M.D. ("Dr. Cain"), completed an RFC assessment on July 12, 2011, and indicated Plaintiff had the following limitations: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds; occasionally reach overhead with the bilateral upper extremities; and frequently finger and feel. Tr. at 595–602.

On July 16, 2011, state agency consultant Judith Von, Ph. D., considered Listing 12.04 for affective disorders, but found that Plaintiff's mental impairment was not severe. Tr. at 603. She determined that Plaintiff had mild difficulties in maintaining social functioning and mild difficulties in maintaining concentration, persistence, or pace. *Id.*

On September 8, 2011, Plaintiff reported lower back pain that radiated into his legs, chronic neck pain that radiated into his shoulders, and numbness in his hands. Tr. at 627. He indicated his lower back pain was causing him to feel depressed. *Id.* He complained of a recent fall onto his outstretched right shoulder that had resulted in pain and reduced ROM. *Id.* Dr. Triana observed Plaintiff to have brisk DTRs, intact motor

groups, and positive SLR tests. *Id.* He indicated Plaintiff lacked full extension and abduction in his right shoulder. *Id.* He prescribed Cymbalta for depression and sleep. *Id.*

On September 19, 2011, an MRI of Plaintiff's right shoulder revealed advanced rotator cuff tendinopathy; a focal full thickness tear of the anterior fibers of the supraspinatus tendon at their insertion; high-grade partial tears of the subscapularis tendon at its insertion with subluxation of the biceps tendon out of the bicipital groove; mild-to-moderate degenerative arthritis of the glenohumeral joint, including chondomalacia and degeneration of the labrum; degenerative arthritis of the acromioclavicular ("AC") joint with a joint effusion and mass effect upon the rotator cuff; and an os acromiale. Tr. at 628–29.

Plaintiff reported pain and difficulty raising his right arm on September 21, 2011. Tr. at 626. He complained that his pain awakened him if he rolled onto his right shoulder during the night. *Id.* Dr. Triana referred Plaintiff to physical therapy and to Brian K. Blair, M.D. ("Dr. Blair"). *Id.* He noted that Vicodin was no longer effectively controlling Plaintiff's pain and prescribed Norco. *Id.*

Plaintiff presented to Dr. Blair for right shoulder pain and mild weakness on October 6, 2011. Tr. at 617. He stated his shoulder pain awakened him from sleep and was exacerbated by overhead activities. *Id.* Dr. Blair observed Plaintiff to have full ROM of his cervical spine. *Id.* He indicated Plaintiff's right shoulder showed no atrophy, winging, or abnormal scapular rhythm. *Id.* Plaintiff was able to forward elevate to 160 degrees actively and 180 degrees passively, but with pain. *Id.* He was able to externally rotate to 75 degrees and to internally rotate to his lumbar spine. *Id.* He demonstrated 4+/5

scaption strength, 5/5 internal rotation strength, and 4+/5 external rotation strength. *Id.* Dr. Blair observed him to be nontender over his AC joint and mildly tender over his biceps and to have mildly positive impingement signs. *Id.* He assessed right shoulder impingement and a full thickness rotator cuff tear. *Id.* He discussed treatment options with Plaintiff, and Plaintiff indicated he desired to wait and see if his symptoms improved before pursuing more invasive treatment. *Id.*

On October 11, 2011, physical therapist Bill Daley indicated Plaintiff's program was complete, that he had met his goals, and that his rehabilitation potential was good. Tr. at 631.

On November 29, 2011, Plaintiff informed Dr. Triana that he had visited Dr. Blair and that he did not desire to proceed with surgery. Tr. at 625. Dr. Triana cautioned Plaintiff "from any kind of lifting, pushing over his head or lifting away from his side." *Id.*

On March 20, 2012, Plaintiff reported "having a lot of pain in his back" that radiated into his bilateral hips and occasionally radiated to his calves. Tr. at 624. He complained of intermittent numbness in his feet. *Id.* He described his back pain as constant and worse on the left than the right. *Id.* He indicated it was exacerbated by prolonged sitting and riding in a car. *Id.* Plaintiff described his neck pain as radiating across his shoulders and occasionally into his head. *Id.* Dr. Triana observed Plaintiff to have normal muscle groups and DTRs. *Id.* He noted Plaintiff showed normal ROM in his neck and upper and lower extremities. *Id.* He prescribed Lyrica and instructed Plaintiff to continue taking Motrin and Norco for pain. *Id.*

On May 22, 2010, Plaintiff complained of neck pain that radiated to his right shoulder and lower back pain that radiated to his bilateral buttocks and hips. Tr. at 653. He reported that Lyrica made him feel a "little loopy." *Id.* Dr. Triana indicated Plaintiff was endorsing a common side effect of Lyrica. *Id.* He instructed Plaintiff to take two Lyrica pills at night instead of taking one during the day and one at night. *Id.* He noted Plaintiff had tried physical therapy, strengthening, restricted activity, and medication and that he would need "to decide if he can live with it or not." *Id.*

Plaintiff presented to Dr. Chastain with depressive symptoms on July 17, 2012. Tr. at 647. Dr. Chastain prescribed 75 milligrams of Effexor XR. *Id.* Plaintiff followed up with Dr. Chastain for depression on September 26, 2012. Tr. at 641. He indicated his depression had improved, but was not controlled. Tr. at 645. Dr. Chastain increased Plaintiff's dosage of Effexor XR to 150 milligrams. *Id.*

Plaintiff presented to George H. Khoury, M.D. ("Dr. Khoury"), on March 11, 2013, with complaints of pain in his neck and low back and carpal tunnel syndrome. Tr. at 677. He also reported knee pain with swelling. *Id.* He described his back pain as radiating from his lower back to his bilateral buttocks and down his posterior legs to his feet. *Id.* He endorsed dysesthesias in his feet and occasional groin pain and stated the pain was worse in his left leg than his right. *Id.* He indicated his pain was exacerbated by sitting for longer than 30 minutes and standing and walking for more than 15–20 minutes. *Id.* Plaintiff described his neck pain as radiating up into the occiput and down into his bilateral shoulders, posterior arms, and hands. *Id.* He stated his pain was exacerbated by elevating his arms and extending his neck. *Id.* He indicated he had been diagnosed with a

right rotator cuff tear and carpal tunnel syndrome. *Id.* He stated he had been awakened during the night with numbness and tingling in his hands. *Id.* Dr. Khoury observed Plaintiff's lower back to show no palpable abnormality; no paraspinal tenderness; no paravertebral spasm; no percussion tenderness; negative Patrick's and Lasegue's signs; and normal lumbar flexion. Tr. at 678. He noted Plaintiff's cervical spine showed no palpable abnormality; no paraspinal tenderness; no paravertebral spasm; no percussion tenderness; normal flexion, extension, and rotation; no L'Hermittes sign; and negative Spurling's maneuver. *Id.* He indicated Plaintiff had no palpable abnormality, paraspinal tenderness, paravertebral spasm, or percussion tenderness in his thoracic spine. *Id.* Dr. Khoury observed Plaintiff to have decreased sensation to pinprick in a nondermatomal pattern in his upper extremities; decreased sensation to light touch and pinprick bilaterally in the L5 distribution; and decreased sensation to vibratory sense in the left lower extremity. *Id.* He noted Plaintiff had 2+ bilateral biceps, triceps, radial, patellar, and Achilles reflexes. *Id.* He indicated Plaintiff had absent Babinski's, Hoffman's, and Ankle clonus, but normal tone. *Id.* Motor testing was normal in Plaintiff's upper and lower extremities. *Id.* Dr. Khoury assessed low back pain, neck pain, carpal tunnel syndrome, lumbar instability, and a bulging lumbar disc. Tr. at 679. He referred Plaintiff for updated x-rays and an MRI of the lumbar spine. *Id.*

On March 15, 2013, an MRI of Plaintiff's lumbar spine showed severe left and moderately-severe right neural foraminal stenosis, secondary to mild disc bulge, marginal osteophytes, and facet arthrosis at L5-S1. Tr. at 668. It indicated facet arthrosis and

moderate-to-moderately-severe left neural foraminal stenosis, secondary to disc bulge and marginal osteophytes at L4-5. *Id.*

Plaintiff followed up with Dr. Khoury to review the MRI report on March 25, 2013. Tr. at 675. Dr. Khoury indicated the MRI showed multilevel degenerative changes in Plaintiff's lumbar spine, as well as a thoracic syrinx. *Id.* He referred Plaintiff for an MRI of his cervical and thoracic spine and for a consultation with James Keffer, D.O. ("Dr. Keffer"), a specialist in neurosurgery physical medicine and rehabilitation. *Id.*

On April 3, 2013, an MRI of Plaintiff's cervical and thoracic spine showed mild syrinx formation that extended "essentially the length of the thoracic spinal cord"; minimal prominence of the central canal in the lower cervical cord; narrowing of the neural foramina at C6-7; and minimal degenerative changes. Tr. at 686–88.

Plaintiff complained of pain in his lumbar spine, groin, and buttocks on April 10, 2013. Tr. at 671. He indicated his pain was moderate. *Id.* He described it as being constant and achy, but occasionally throbbing. *Id.* He stated his pain was aggravated by household activities, prolonged sitting, prolonged standing, twisting, and lifting and was reduced by rest, medication, and lying down. *Id.* Dr. Keffer observed Plaintiff to have hip and knee ROM that was within functional limits; normal to brisk reflexes; 5/5 lower extremity motor testing; intact sensation to pinprick; normal lower extremity tone; and negative SLR tests. Tr. at 672–73. He assessed lower back pain and lumbar radiculitis. Tr. at 673. He prescribed Gralise and referred Plaintiff for physical therapy. *Id.*

On December 19, 2013, Plaintiff indicated he struggled with daily right-sided pain that radiated to his groin. Tr. at 693. Dr. Triana reviewed Plaintiff's most recent MRI and

indicated he believed the L4-5 disc was the source of his complaints because his symptoms correlated with the L4 nerve root. Tr. at 693–94. He discontinued Plaintiff's prescription for Vicodin and prescribed Norco. Tr. at 693. He recommended a nerve root block to isolate Plaintiff's pathology to the L4-5 disc and nerve. Tr. at 694.

On March 6, 2014, Plaintiff indicated he had recently aggravated his chronic pain by picking up limbs in his yard. Tr. at 720. He requested he be referred to an orthopedist. *Id.* Angela Morris, M.D. ("Dr. Morris"), observed Plaintiff to have pain with palpation over the SI notch bilaterally and positive bilateral SLR tests. Tr. at 721. She referred him to MUSC Orthopedics. *Id.*

Plaintiff presented to John A. Glaser, M.D. ("Dr. Glaser"), on March 19, 2014. Tr. at 724. Dr. Glaser observed Plaintiff to have normal gait and balance; functional ROM in the joints of his lower extremities; an intact sensory examination; the ability to heel and toe rise; and no weakness to manual motor testing of hip flexors, knee extensors, hip adduction, hip abduction, knee flexors, dorsiflexion, plantar flexion, inversion, eversion, or great toe extension bilaterally. Tr. at 725. He performed provocative testing for SI joint dysfunction. *Id.* He noted that Gaenslen, Fortin finger, Faber, and pelvic compression tests were positive, but that thigh thrust and pelvic distraction tests were negative. *Id.* Dr. Glaser stated he was not sure whether the SI joint was the source of the pain, but that it should be considered. *Id.* He advised Plaintiff to follow up with Emily A. Darr, M.D. ("Dr. Darr"), for an SI joint ESI. *Id.*

Plaintiff presented to Dr. Darr on March 27, 2014. Tr. at 726. Dr. Darr observed Plaintiff to have good ROM of the hip and to have no provocation with interior and

exterior rotation. Tr. at 727. She noted positive Fortin finger, compression, and Faber tests. *Id.* She observed Plaintiff to have normal reflexes; intact sensation; good strength in all major muscle groups; mild gluteus medius muscle weakness on the left; negative SLR tests; and a negative femoral nerve stretch test. *Id.* She administered an SI joint injection. Tr. at 725–26.

On August 26, 2014, Plaintiff complained that his pain was worse than it had ever been. Tr. at 691. He indicated that the SI joint injections had provided no relief. *Id.* Dr. Triana indicated he would refer Plaintiff to Channing Willoughby, M.D. ("Dr. Willoughby"), for a selective nerve root block. *Id.* He noted that "[a]ny heavy lifting, pushing, pulling greater than 10 lbs or repetitive sitting, standing, walking, squatting, bending, crawling longer than 15 minutes etc will only aggravate [Plaintiff's] symptoms further." Tr. at 691–92. He stated he would encourage Plaintiff "to avoid these or other offending activities if at all possible." Tr. at 692.

Plaintiff presented to Dr. Willoughby for a consultation on September 30, 2014. Tr. at 704. He reported pain in his lower back that radiated into his right hip and groin and numbness in his bilateral feet. *Id.* He described his pain as achy and indicated it was exacerbated by standing and was reduced by changing positions and lying flat. *Id.* Dr. Willoughby observed Plaintiff to have grossly intact coordination; stable gait; grossly preserved sensation in the lower extremities; symmetric, 1+ bilateral patellar reflexes and DTRs; no clonus; 5/5 strength in the distal extremities; normal muscle bulk and tone; diffuse tenderness to palpation of the lumbosacral spine; and good ROM of the bilateral hips and knees. Tr. at 706. He indicated Plaintiff's lumbar flexion and extension were

preserved "for the most part," but did reproduce baseline pain. *Id.* Dr. Willoughby agreed with Dr. Triana that the L4-5 level could be causing some of Plaintiff's pain. *Id.* He indicated he would proceed with bilateral selective nerve root blocks at the L4-5 level. *Id.* He recommended that Plaintiff continue taking anti-inflammatory medications and engage in a daily walking regimen for core muscle strength. *Id.* Dr. Willoughby administered bilateral L4-5 transforaminal ESIs on October 23, 2014. Tr. at 702–03.

On October 31, 2014, Plaintiff reported that he had noticed some changes in his feet following the transforaminal ESI. Tr. at 689. He continued to report low back pain that radiated into his buttocks, hips, legs, and groin. *Id.* Dr. Triana increased Plaintiff's Flexeril dosage and encouraged him to follow up with Dr. Willoughby. *Id.*

On December 8, 2014, Plaintiff described his pain as a shooting pain that radiated from his back to his bilateral legs and right groin. Tr. at 699. Dr. Willoughby observed Plaintiff to have 5/5 strength in his distal extremities; diffuse tenderness in his lumbosacral spine; grossly intact coordination; and slow and cautious, but stable gait. Tr. at 700. He assessed chronic pain syndrome, lumbar degenerative disc disease, lumbar stenosis, and lumbar radiculopathy. Tr. at 700–01. He recommended bilateral L4-5 transforaminal ESIs, spinal cord stimulation, and light physical therapy. Tr. at 701.

Plaintiff followed up with Dr. Triana on December 11, 2014. Tr. at 709. He described his pain as radiating from his lower back to his right buttock and groin and left posterior hamstring and calf. *Id.* He described his neck pain as radiating bilaterally, but waxing and waning. *Id.* Dr. Triana increased Plaintiff's Norco dosage from 5-325 milligrams to 10-325 milligrams. *Id.* He informed Plaintiff that he was reluctant to

pinpoint L4-5 as the source of his complaints because he had reported no significant change after L4-5 transforaminal ESIs. *Id.* He indicated Plaintiff's pathology did not warrant multilevel fusion at that time. *Id.* He stated he would try to keep Plaintiff "as pain tolerable and functional with occasional injection, medication, [and] restriction of activities." *Id.*

On February 27, 2015, Dr. Triana indicated on a disability claim form that Plaintiff's disability had begun in 2004. Tr. at 729. He stated Plaintiff was "NEVER RETURNING" to work. *Id.* He indicated Plaintiff's diagnoses were degenerative disc disease of the cervical and lumbar spine. *Id.* He stated Plaintiff's treatment had included medication, epidural injections, and avoiding offending activity. *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

i.    December 13, 2012

Plaintiff testified he was 5'11" tall and weighed 240 pounds. Tr. at 85. He indicated he last worked on May 20, 2010. Tr. at 86. He stated he stopped working because of pain in his back and legs. *Id.* He confirmed that he had received workers' compensation benefits and that his case had been settled in November 2010. Tr. at 87.

Plaintiff testified he was unable to work because of difficulty bending and lifting. Tr. at 87. He endorsed pain in his lower back, neck, and shoulders. *Id.* He described his lower back pain as constant, but indicated the pain in his neck and shoulders occurred intermittently. Tr. at 87–88. He stated his neck pain radiated to his head and into his arms

and shoulders. Tr. at 95. Plaintiff also reported pain in his legs that occurred sporadically. Tr. at 88. He stated the pain was worse in his left leg, but sometimes radiated to both legs. Tr. at 94. He testified he experienced swelling in his left knee and numbness in his feet. *Id.* He indicated he had been diagnosed with a torn right rotator cuff. Tr. at 96. He stated he had difficulty lifting and carrying things and had poor ROM. *Id.* He reported he also had bilateral carpal tunnel syndrome. Tr. at 97. He indicated that his thumb sometimes locked and that he experienced cramping and pain in his hands with use. Tr. at 98.

Plaintiff stated he was reluctant to undergo surgery because he was afraid of complications and his doctors could not guarantee him that it would improve his symptoms. Tr. at 93 and 97. He indicated he took Lyrica and Hydrocodone for pain. Tr. at 88 and 96. He stated his medication caused him to feel drowsy. Tr. at 88.

Plaintiff indicated Dr. Chasteen had diagnosed him with depression and prescribed Effexor. Tr. at 90. He testified that Effexor had provided some relief and that Dr. Chasteen had not referred him for counseling. Tr. at 91. He indicated he had developed symptoms of depression after his parents passed away in June 2009. Tr. at 91.

Plaintiff indicated he could shower, dress, care for his personal needs, and perform minor household chores. Tr. at 91–92. He testified he could sit for 10 to 15 minutes and stand for 20 minutes at a time. Tr. at 89. He estimated he spent 16 to 18 hours per day either sitting, lying down, or in a recliner. Tr. at 92. He indicated he alternated between sitting, standing, walking, and lying down to reduce his pain. Tr. at 100. He stated he spent three to four hours per day lying down. *Id.* He indicated he had difficulty focusing

and maintaining concentration. Tr. at 100–01. He testified he had a driver's license and was able to drive. Tr. at 85.

ii.      December 19, 2014

Plaintiff testified that his condition had not improved since his last hearing. Tr. at 50. He endorsed constant pain and reported increased pain in his hips and groin. *Id.* He complained of daily radiating pain in his neck and shoulder that was exacerbated by increased use. Tr. at 50–51. He indicated he continued to treat with Dr. Triano every six months. Tr. at 47. He denied having received mental health treatment. *Id.* He stated he continued to receive injections in his lower back. Tr. at 48–49. He indicated he had participated in physical therapy. Tr. at 49.

Plaintiff estimated he could walk for 10 to 15 minutes and could sit for 15 to 20 minutes at a time. Tr. at 47 and 56. He indicated he could lift items that weighed less than 10 pounds. Tr. at 57. The ALJ asked Plaintiff if he continued to spend 16 to 18 hours per day lying down or in a recliner. Tr. at 47. Plaintiff testified that he was making an effort to move around more often, but was most comfortable when lying down. Tr. at 48. He indicated his right shoulder mobility had improved slightly, but that he continued to experience pain when he lifted or put pressure on it. Tr. at 51–52. He stated he developed pain and numbness when he attempted to use his hands repetitively. Tr. at 57. He indicated his right hand was worse than his left. Tr. at 58. He endorsed difficulty with climbing stairs repeatedly and picking up items from the floor. Tr. at 59.

Plaintiff testified he was taking Hydrocodone 10-325 milligrams specifically for pain. Tr. at 46. He indicated he also used a muscle relaxer. Tr. at 48. He stated he

experienced itching and drowsiness as side effects of his pain medication. Tr. at 47. He indicated Dr. Gamble had prescribed medication for depression. Tr. at 55. He stated the medication helped him to better manage his depressive symptoms, but indicated he continued to have good and bad days. *Id.*

Plaintiff testified that he had declined to undergo shoulder surgery and was reluctant to pursue any surgical intervention. Tr. at 52. However, he stated he would be willing to undergo back surgery if Dr. Triano could guarantee that it would relieve his back pain. Tr. at 52–53.

Plaintiff testified he was able to bathe and dress himself. Tr. at 58. He indicated he took out the trash, cleaned dishes, and straightened up around the house. *Id.* He stated he would be unable to alternate sitting and standing to complete a workday because he would need to lie down half of the time. Tr. at 60.

### b.     Vocational Expert Testimony

### i.     December 13, 2012

Vocational Expert ("VE") Mark Stebnicki, Ph. D., reviewed the record and testified at the hearing. Tr. at 104–09. The VE categorized Plaintiff's PRW as a machine maintenance mechanic, *Dictionary of Occupational Titles* ("*DOT*") number 638.281-014, as heavy in exertional level with a specific vocational preparation ("SVP") of seven. Tr. at 105. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work that required no overhead work; only occasional kneeling and crawling; no climbing of ladders or scaffolds; no exposure to temperature extremes or vibrations; no unprotected heights or dangerous machinery; and frequent stooping and

bilateral fingering and handling. *Id.* He indicated the individual would also be limited to simple, repetitive tasks that did not involve ongoing interaction with the general public. *Id.* The ALJ asked the VE if the individual would be able to perform jobs. Tr. at 105. The VE testified that the individual could perform light jobs with an SVP of two as an order caller, *DOT* number 209.667-014, with 3,100 positions in South Carolina and 217,000 positions in the national economy; a routing clerk, *DOT* number 222.687-022, with 1,100 positions in South Carolina and 76,000 positions in the national economy; and an office helper, *DOT* number 239.567-010, with 2,900 positions in South Carolina and 231,000 positions in the national economy. Tr. at 106. The ALJ asked the VE if the individual would be able to perform jobs if he were restricted to occasional bilateral handling and fingering. *Id.* The VE was unable to identify any jobs the individual could perform. Tr. at 106–08.

Plaintiff's attorney asked the VE to consider the restrictions in the first hypothetical question, but to further assume the individual would have to rest in a reclined position for in excess of one hour during the workday. Tr. at 108. The VE stated the individual would be unable to perform the jobs identified in response to the first question. *Id.*

Plaintiff's attorney asked the VE to consider that the individual would have problems with attention and focus that would cause him to be off task for 20 percent of the workday. Tr. at 108–09. The VE indicated the restriction would affect the individual's ability to engage in employment. Tr. at 109.

Vocational Expert ("VE") Carroll Crawford reviewed the record and testified at the hearing. Tr. at 60–64. The VE categorized Plaintiff's PRW as a maintenance mechanic as heavy and skilled. Tr. at 60. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform sedentary work that required no overhead work; occasional kneeling and crawling; no climbing of ladders or scaffolds; frequent stooping, climbing of ramps or stairs, and bilateral handling and fingering; and no exposure to temperature extremes, vibration, or work hazards such as unprotected heights or dangerous machinery. Tr. at 61. He asked the VE to further assume the individual would be limited to simple, repetitive tasks. *Id.* The VE testified that the hypothetical individual would be unable to perform Plaintiff's PRW. *Id.* The ALJ asked whether there were any other jobs in the regional or national economy that the hypothetical person could perform. *Id.* The VE identified sedentary jobs with an SVP of two as an assembler, *DOT* number 734.687-018, with 5,200 positions in South Carolina and 350,000 positions nationally; a bench hand worker, *DOT* number 715.684-026, with 1,200 positions in South Carolina and 84,000 positions nationally; and a weight tester, *DOT* number 539.485-010, with 1,240 positions in South Carolina and 84,000 positions nationally. Tr. at 61–62. The ALJ asked if any of those jobs required ongoing interaction with the general public. Tr. at 62. The VE indicated they did not. *Id.* The ALJ asked the VE to assume the individual could perform frequent fine manipulation, but only occasional gross manipulation. *Id.* He asked how that change would affect the cited jobs.

*Id.* The VE indicated that if handling were limited to occasional, the individual would be unable to perform any sedentary, unskilled job. *Id.*

Plaintiff's attorney asked the VE if his response to the ALJ's last question would differ if the hypothetical individual were limited to occasional gross manipulation with only the dominant upper extremity. Tr. at 64. The VE indicated it would not. *Id.*

### 2. The ALJ's Findings

In his decision dated February 13, 2015, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.
2. The claimant engaged in substantial gainful activity during the following periods: 11/1996 to 05/2010 (20 CFR 404.1520(b) and 404.1571 *et seq.*).
3. However, there has been a continuous 12-month period(s) during which the claimant did not engage in substantial gainful activity. The remaining findings address the period(s) the claimant did not engage in substantial gainful activity.
4. The claimant has the following severe impairments: obesity, degenerative disc disease, rotator cuff tear, carpal tunnel syndrome, and depression (20 CFR 404.1520(c)).
5. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
6. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except he cannot perform overhead work; he can occasionally kneel and crawl; he cannot climb ladders or scaffolds; he can frequently stoop; he can have no exposure to temperature extremes, vibration, unprotected heights or dangerous machinery; he can frequently finger/handle bilaterally; and is limited to simple, repetitive tasks with no ongoing interaction with the general public.
7. The claimant is unable to perform any past relevant work (20 CFR 404.1565).
8. The claimant was born on May 19, 1968 and was 40 years old, which is defined as a younger individual age 18–44, on the alleged disability onset

date. The claimant subsequently changed age category to a younger individual age 45–49 (20 CFR 404.1563).

9. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

10. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

12. The claimant has not been under a disability, as defined in the Social Security Act, from February 8, 2009, through the date of this decision (20 CFR 404.1520(g)).

Tr. at 26–34.

II. Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1) the ALJ erred in failing to give controlling weight to Plaintiff's treating physician's medical opinion;

2) the evidence does not support the ALJ's finding that Plaintiff could perform frequent handling;

3) the ALJ did not adequately assess Plaintiff's credibility; and

4) the Appeals Council erred in failing to admit additional evidence.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.     Legal Framework

1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[4] (4) whether such

---

[4]  The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen*

impairment prevents claimant from performing PRW;[5] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v.*

---

*v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[5] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

*Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.      The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is

substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

### B.    Analysis

#### 1.    Treating Physician's Opinion

On February 23, 2012, Dr. Blair completed a medical source statement. Tr. at 659–62. He indicated Plaintiff's lifting and carrying abilities were affected by his impairment and that Plaintiff could occasionally lift 10 pounds and could frequently lift less than 10 pounds. Tr. at 659–60. He stated standing, walking, and sitting were not affected by Plaintiff's impairment. Tr. at 660. He indicated Plaintiff was limited in his abilities to push and pull with his upper extremities. *Id.* He stated Plaintiff could occasionally crawl, stoop, and climb ramps, stairs, ladders, ropes, and scaffolds and could frequently balance, kneel, and crouch. Tr. at 661. He noted Plaintiff had limited abilities to reach in all directions and to engage in gross manipulation. *Id.* He limited Plaintiff to occasional reaching and handling, but indicated he could perform constant fingering and feeling. *Id.*

Plaintiff argues the ALJ erred in declining to accord controlling weight to Dr. Blair's opinion. [ECF No. 7 at 27]. He maintains that the ALJ should have accorded more weight to the opinion based on his treatment relationship with Dr. Blair, the MRI report, and Dr. Blair's specialization as an orthopedist. *Id.* at 27–28. He contends the ALJ provided no reason for rejecting Dr. Blair's assessment that he would be limited to no more than occasional reaching and handling. *Id.* at 28–29.

The Commissioner argues the ALJ's RFC assessment was "more generous than Dr. Blair's assessment" in that it limited Plaintiff to no more than frequent handling and fingering and no overhead work. [ECF No. 8 at 9]. She maintains the ALJ reasonably discounted the opinion as vague based on Dr. Blair's failure to explain the findings that supported it. *Id.*

The regulations direct that ALJs accord controlling weight to treating physicians' opinions that are well-supported by medically-acceptable clinical and laboratory diagnostic techniques and that are not inconsistent with the other substantial evidence of record. 20 C.F.R. § 404.1527(c)(2). Pursuant to 20 C.F.R. § 404.1527(a)(2), a "[t]reating source means your own acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." The regulation further provides that the Social Security Administration ("SSA") "will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s)." 20 C.F.R. § 404.1527(a)(2). The SSA may consider acceptable medical sources who have treated a claimant "only a few times or only after long intervals" to be treating sources "if the nature and frequency of the treatment or evaluation is typical for" the claimant's condition. *Id.* The SSA will not consider a medical provider to be a treating medical source if the relationship between the claimant and the medical provider is not based on

the claimant's medical need for treatment, but instead on the need to obtain a report in support of the claim for disability." *Id.*

If the record contains no opinions from treating medical sources or if the ALJ declines to accord controlling weight to the treating sources' opinions, he must proceed to weigh each medical opinion of record based on the factors in 20 C.F.R. § 404.1527(c). *Johnson*, 434 F.3d at 654. These factors include (1) the examining relationship between the claimant and the medical provider; (2) the treatment relationship between the claimant and the medical provider, including the length of the treatment relationship and frequency of treatment and the nature and extent of the treatment relationship; (3) the supportability of the medical provider's opinion in his or her own treatment records; (4) the consistency of the medical opinion with other evidence in the record; and (5) the specialization of the source offering the opinion. *Id.*; 20 C.F.R. § 404.1527(c). The ALJ's decision must provide an adequate explanation for accepting or rejecting medical source statements. SSR 96-5p.

This court should not disturb an ALJ's determination as to the weight to be assigned to a medical source opinion "absent some indication that the ALJ has dredged up 'specious inconsistencies,' *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has not given good reason for the weight afforded a particular opinion." *Craft v. Apfel*, 164 F.3d 624 (Table), 1998 WL 702296, at *2 (4th Cir. 1998) (per curiam).

Although Plaintiff argues Dr. Blair's opinion was presumptively entitled to controlling weight as the opinion of a treating physician, the evidence suggests Dr. Blair was not a treating physician as defined in the regulations. In *James v. Astrue*, No. 2:09-

3181-DCN-RSC, 2011 WL 846567, at \*15 (D.S.C. Mar. 9, 2011), the court found that the ALJ was not required to accord controlling weight to a medical source statement from a physician who only examined the plaintiff on one occasion. The court noted that the evidence suggested the plaintiff presented to the physician for the sole purpose of obtaining a medical opinion. *James*, 2011 WL 846567, at \*15. It recognized that the regulations confer deference on treating physicians' opinions because "a treating physician who treats a patient over time '*may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone or from reports of individual examinations, such as consultative examinations* or brief hospitalizations.'" *Id.*, citing 20 C.F.R. § 404.1527(d)(2) (emphasis added). Dr. Blair's opinion differs from that of the physician in *James* because Plaintiff did not present to him to obtain an opinion to support his claim for disability. The record shows that Dr. Triana referred Plaintiff to Dr. Blair for an evaluation based on his complaint of shoulder pain. Tr. at 626. Dr. Blair's records suggested that he would have continued to treat Plaintiff's shoulder pain if Plaintiff had opted for surgical intervention. Tr. at 617. However, the fact remains that Dr. Blair did not treat Plaintiff over a period of time. Therefore, he lacked the ability to bring the "unique perspective" that could be offered by a physician who maintained "an ongoing treatment relationship" with Plaintiff. *See James*, 2011 WL 846567, at \*15. Based on the court's finding in *James* and the specific language in 20 C.F.R. § 404.1527(a)(2), Dr. Blair's opinion was not presumptively entitled to controlling weight as that of a treating physician.

Nevertheless, the ALJ was required to evaluate it based on the factors in 20 C.F.R. § 404.1527(c) and adequately explain the reason for the weight he gave the opinion. The ALJ evaluated Dr. Blair's opinion and gave it "significant weight." *See* Tr. at 31. He acknowledged the examining relationship between Plaintiff and Dr. Blair, the supportability of Dr. Blair's opinion with his examination findings, and the consistency of his opinion with the record as a whole. *See* Tr. at 30 (discussing Dr. Blair's findings on examination) and 31 (finding Dr. Blair's opinions were "consistent with his clinical findings on examination" and were "well supported by the weight of the evidence of record"). The ALJ indicated all of these factors weighed in favor of the opinion. *See* Tr. at 31.

Although the ALJ stated that he declined to accord additional weight to Dr. Blair's medical source statement because it was "somewhat vague as to the degree of limitations recommended" (Tr. at 31), this explanation does not allow for meaningful review. It is unclear from the record what the ALJ meant by "degree of limitations." However, the undersigned notes that Dr. Blair was very specific as to the frequency with which he believed Plaintiff could engage in activities. *See* Tr. at 660–61 (indicating Plaintiff could occasionally reach, handle, crawl, stoop, and climb ramps, stairs, ladders, ropes, and scaffolds; frequently balance, kneel, and crouch; and constantly finger and feel objects). While the Commissioner argues that Dr. Blair's opinion was "vague" to the extent that he failed to reference the findings that supported the specified restrictions (ECF No. 8 at 9), the ALJ did not make this argument. Instead, he found that Dr. Blair's opinion was "consistent with his clinical findings on examination" and was "well supported by the

weight of the evidence of record." Tr. at 31. Thus, the court is left to speculate as to what the ALJ found to be "somewhat vague." Furthermore, the court cannot accept the Commissioner's post hoc rationalization for the ALJ's finding where such explanation is absent from the ALJ's decision. *See Robinson ex rel. M.R. v. Comm'r of Soc. Sec.*, No. 0:07-3521-GRA, 2009 WL 708267, at *12 (D.S.C. 2009) ("[T]he principles of agency law limit this Court's ability to affirm based on post hoc rationalizations from the Commissioner's lawyers . . . '[R]egardless [of] whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for [his] decision and confine our review to the reasons supplied by the ALJ.'"), citing *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002).

A comparison of Dr. Blair's medical source statement and the ALJ's RFC assessment reveals similar restrictions with respect to sedentary work and occasional crawling. *Compare* Tr. at 28, *with* 659–60 and 661. The ALJ assessed more significant restrictions than Dr. Blair with respect to Plaintiff's abilities to kneel; climb ladders, ropes, and scaffolds; be exposed to temperature extremes, vibration, unprotected heights, and dangerous machinery; perform overhead work; and finger/feel. *Compare* Tr. at 28, *with* Tr. at 661–62. However, Dr. Blair specified greater restrictions than the ALJ with respect to Plaintiff's abilities to stoop, reach in directions other than overhead, and handle items. *Compare* Tr. at 28, *with* Tr. at 661. A thorough review of the ALJ's decision yields no explanation as to why the ALJ rejected the additional limitations Dr. Blair assessed.

Furthermore, the undersigned notes that Dr. Blair was an orthopedist who examined Plaintiff exclusively based on his right shoulder symptoms. A review of the

ALJ's decision shows no citation of Dr. Blair's orthopedic specialization, which is a factor relevant to the evaluation process under 20 C.F.R. § 404.1527(c)(5). It contains no acknowledgment of Dr. Blair's unique ability to provide an opinion with respect to Plaintiff's use of his right shoulder given his medical specialization.

In light of the foregoing, the undersigned recommends the court find the ALJ neglected to adequately evaluate and explain how he considered Dr. Blair's opinion based on the relevant factors in 20 C.F.R. § 404.1527(c).

### 2.     Frequent Handling and Fingering

Plaintiff argues his treating physician's opinion, EMG evidence of severe carpal tunnel syndrome, his history of rotator cuff injury, and his testimony refute the ALJ's finding that he could handle and reach frequently during a workday. [ECF No. 7 at 29–30].

The Commissioner argues that substantial evidence supports the ALJ's RFC finding. [ECF No. 8 at 9]. She maintains that Dr. Triana did not indicate Plaintiff was limited in his ability to use his bilateral hands on a frequent basis, but, instead, indicated he should wear wrist splints when he used his hands repetitively. *Id.* at 10.

To adequately assess an individual's RFC, the ALJ must determine the limitations imposed by his impairments and how those limitations affect his ability to perform work-related physical and mental functions on a regular and continuing basis. SSR 96-8p. The ALJ should consider all the claimant's allegations of physical and mental limitations and restrictions, including those that result from severe and nonsevere impairments. *Id.* "The RFC assessment must include a narrative discussion describing how all the relevant

evidence in the case record supports each conclusion and must cite specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." *Id.* The ALJ must also consider and explain how any material inconsistencies or ambiguities in the record were resolved. *Id.* "The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.* "[R]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio*, 780 F.3d at 636, citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

In explaining his RFC assessment, the ALJ stated he limited Plaintiff to frequent bilateral handling and fingering "secondary to the allegations of carpal tunnel syndrome" and added postural restrictions "to avoid pain enhancement." Tr. at 32. While the ALJ found rotator cuff tear to be among Plaintiff's severe impairments (Tr. at 27), he did not specify which restrictions in the RFC assessment were imposed based on the rotator cuff tear. *See* Tr. at 32. He did not explain why he concluded that Plaintiff could perform frequent handling despite Dr. Blair's indication that his right rotator cuff tear limited him to occasional handling. *Compare* Tr. at 28 and 32, *with* Tr. at 661. He also failed to explain why he restricted Plaintiff's ability to reach overhead, but did not restrict his ability to reach in all other directions. *Compare* Tr. at 28, *with* Tr. at 661. Based on the foregoing, the undersigned recommends the court find the ALJ's RFC assessment is deficient to the extent that it fails to adequately address relevant functions.

3.    Credibility Assessment

Plaintiff argues the ALJ erred in finding his testimony to be less than fully credible. [ECF No 7 at 30]. He maintains that his complaints of pain were consistent throughout the record and that the severity and extent of his symptoms were supported by the objective medical evidence. *Id.* at 31.

The Commissioner argues the ALJ's credibility assessment is supported by the absence of evidence of nerve compression or nerve root impingement on the most recent MRI and lower extremity EMG studies and Plaintiff's refusal to undergo surgery for rotator cuff tear or carpal tunnel release. [ECF No. 8 at 11].

After finding that a claimant has a medically-determinable impairment that could reasonably be expected to produce his alleged symptoms, the ALJ should evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the restrictions they impose on his ability to do basic work activities. SSR 96-7p.[6]  If the claimant's statements about the intensity, persistence, or limiting effects of his symptoms are not substantiated by the objective medical evidence, the ALJ is required to consider the claimant's credibility in light of the entire case record. *Id.* The ALJ must consider "the medical signs and laboratory findings, the individual's own statements about the

---

[6] The Social Security Administration recently published SSR 16-3p, 2016 WL 1119029 (2016), which supersedes SSR 96-7p, eliminates use of the term "credibility," and clarifies that subjective symptom evaluation is not an examination of an individual's character. Because the ALJ decided this case prior to March 16, 2016, the effective date of SSR 16-3p, the court analyzes the ALJ's decision based on the provisions of SSR 96-7p, which required assessment of the claimant's credibility. Although SSR 16-3p eliminates the assessment of credibility, it requires assessment of most of the same factors to be considered under SSR 96-7p.

symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." *Id.* In addition to the objective medical evidence, the ALJ should also consider the claimant's activities of daily living ("ADLs"); the location, duration, frequency, and intensity of his pain or other symptoms; factors that precipitate and aggravate his symptoms; the type, dosage, effectiveness, and side effects of his medications; treatment, other than medication, he receives or has received; any measures other than treatment and medications he uses or has used to relieve his pain or other symptoms; and any other relevant factors concerning his limitations and restrictions. *Id.*

The ALJ must cite specific reasons to support his credibility finding and his reasons must be consistent with the evidence in the case record. *Id.* His decision must clearly indicate the weight he accorded to the claimant's statements and the reasons for that weight. *Id.* In *Mascio v. Colvin*, 780 F.3d 632, 639–40 (4th Cir. 2015), the court emphasized the need to compare the claimant's alleged functional limitations from pain to the other evidence of record and indicated an ALJ should explain how he decided which of a claimant's statements to believe and which to discredit. The court subsequently stressed that an ALJ's decision must "build an accurate and logical bridge from the evidence" to the conclusion regarding the claimant's credibility. *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016), citing *Clifford v. Apfel*, 227 F.3d 872 (7th Cir. 2000).

The ALJ concluded that Plaintiff's statements concerning the intensity, persistence, or limiting effects of his impairments were not substantiated by the objective medical evidence. He found that Plaintiff's medically-determinable impairments "could reasonably be expected to cause some of the alleged symptoms," but that his "statements concerning the intensity, persistence and limiting effects of these symptoms" were "not entirely credible." Tr. at 29. He noted Plaintiff had "not undergone surgery for his rotator cuff tear"; the negative EMG was "entirely inconsistent with complaints of radicular pain"; and "[t]he most recent MRI indicated no nerve root impingement." *Id.* The ALJ indicated he "accorded the claimant the benefit of the doubt and further reduced the residual functional capacity to include his limitations as described" in the RFC assessment even though Plaintiff's "allegations of such significant limitations and pain were not fully consistent with the medical evidence of record." Tr. at 32. He stated he could not credit Plaintiff's "allegations that he [was] incapable of all work activity" based on "significant inconsistencies in the record as a whole." *Id.*

Despite the ALJ's statements, his decision does not show that he considered the entire record in evaluating Plaintiff's credibility. As discussed above, the ALJ did not explain his reasons for rejecting Dr. Blair's opinion or for declining to limit Plaintiff to occasional handling and reaching. Although the ALJ referenced Plaintiff's reports that his medication caused drowsiness; that he was limited in his abilities to sit, stand, and walk; and that he experienced cramping in his hands, he did not compare these alleged functional limitations to the evidence. He did not specify which of Plaintiff's alleged functional limitations he was crediting and rejecting. In light of the foregoing, the

undersigned recommends the court find the ALJ failed to "build an accurate and logical bridge from the evidence" to his finding that Plaintiff's statements were not entirely credible. *See Monroe*, 826 F.3d at 189.

### 4. Evidence Submitted to the Appeals Council

Plaintiff argues the Appeals Council erred in failing to include evidence he submitted with his request for review. [ECF No. 7 at 2]. The Commissioner maintains the Appeals Council reviewed the evidence; admitted some of it, but found it unpersuasive; and declined to admit other evidence because it was either duplicative or unrelated to the relevant period.

In light of the undersigned's recommended findings of error with respect to the ALJ's decision, it is unnecessary for the court to address this issue. Because Plaintiff will have the opportunity to submit additional evidence on remand, he should submit all evidence that pertains to the relevant period. The ALJ should then evaluate any relevant and non-duplicative evidence as part of the entire record.

## III. Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of

42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

April 11, 2017                                    Shiva V. Hodges
Columbia, South Carolina                 United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).